DECISION
In this case the plaintiff, DEPCO, has sued the defendants for damages for the failure by the defendants to repay sums of money advanced to them by Rhode Island Central Credit Union (RICCU) on December 5, 1990, as part of a loan agreement entered into between the credit union and the defendants. The defendants claim that they are entitled to set off against the plaintiff's claim damages they have incurred from RICCU's failure to carry out its part of the loan agreement to finance the defendants' development project in full.
So far as this litigation is concerned, the relevant agreement among the credit union and the defendants is embodied in, and memorialized by three sets of documents: a construction loan agreement, a promissory note and individual guarantees by the defendant guarantors. These documents must be construed together without reference to any extrinsic evidence, except where the intent of the parties is not clearly and unambiguously expressed in plain language understandable to a reasonable person with customary fluency in the language in which the documents are written.
At the closing, $525,000 was disbursed under the loan agreement for the benefit of the defendants. Under the agreement, the defendants, including the guarantors, became obligated to repay that amount to RICCU, together with interest subject to penalties for late payment.
There is no express provision in any document that any failure by RICCU to carry out any obligation on its part will excuse the defendants from their obligations to repay RICCU for its advances. Put another way, the writings are silent as to anyagreed consequences of a failure by RICCU to fund the project fully. The defendants have presented credible evidence that they understood that a failure by the credit union to carry out its obligations in full would relieve them of their obligations to repay advances. In the absence of any evidence that the credit union contemporaneously and mutually shared and acquiesced in that understanding, neither it nor its successors can be bound by it.
It is clear from the evidence that the agreement of the parties contemplated a continuing financial relationship. The advance of the $525,000 at the closing was only one part of what clearly was to be an integrated and continuing transaction. The lender was to continue to make advances and the borrower was to pay down principal as units were built and sold. The continuing nature of the financing transaction is clear from the loan agreement, which provided that although the total amount financed was to be $2.1 million, the outstanding principal would never be more than $900,000, because principal was to be paid down by the sale of units and advances for the successive construction of building were not to be made until all units in an already financed building had been sold. The plaintiff does not, of course, claim that the defendants owe it $2.1 million, even though that is the face amount of the note, upon which they purport to be suing.
The defendants have presented persuasive evidence that their project, Phase II of Bowen Court Condominium Complex, had the highest prospects of ultimate success. What they did not know was that their financing was doomed to failure.
On January 1, 1991; then Governor Bruce Sundlun declared that a banking emergency existed with respect to RICCU and other financial institutions insured by Rhode Island Share and Deposit Insurance Company. On the same date, the director of the Department of Business Regulation effectively barred the credit union from disbursing any funds. On January 8, 1991, the borrower made a requisition for funds under the agreement for the payment of interest, although it knew it would not be advanced.
On March 27, 1991, this Court, in another proceeding, appointed the director as temporary receiver of the credit union. On May 3, 1991, his appointment was made permanent. On July 15, 1991, the borrower filed a claim in the receivership for its losses resulting from the closed credit union's failure to continue to fund the project. The receiver sold the real estate of the development at a mortgage foreclosure sale to himself on June 10, 1992. Thereafter, on June 24, 1992, he assigned all of the credit union's assets, including the claims against these defendants, to DEPCO.
The plaintiff argues that the transfer on June 24, 1992 was a magic moment, when any taint attached to any failure of the credit union or its receiver was washed away by operation of law. To understand the plaintiffs contention, which has hitherto been generally successful in cases like this one, a careful review of the statute, the transfer documentation, and precedent is necessary.
The plaintiff was created by the Rhode Island Depositors Economic Protection Act (P.L. 1999, ch. 3, § 4; G.L. §42-116-1, et seq.) to acquire the assets of the failed financial institutions and to pay off depositors of those institutions. InG.L. § 42-116-6(2) the plaintiff was empowered as follows by law:
 "42-116-6. Additional general powers.I — In addition to the powers enumerated in this chapter, except to the extent inconsistent with any specific provision of this chapter, the corporation has power:
 * * *
 (2) In connection with the acquisition of all or any portion of the assets of an eligible institution, to assume all, none, or any portion of the liabilities, including deposit liabilities, of an eligible institution at the terms and in the manner that the corporation deems advisable; provided however that the corporation is responsible and liable only for those liabilities specifically assumed and bears no responsibility or liability for any other debts or liabilities of the eligible institutions. . . ." (Emphasis supplied).
Pursuant to that authority, in May 1992 the plaintiff offered to purchase all of the credit unions assets "free and clear of all mortgages, security interests, liens, attachments, encumbrances, claims and counterclaims whatsoever . . ."
On May 22, 1992, this Court approved the transfer of the credit union's assets to the plaintiff under the offer, providing that the transfers were made "free and clear of all mortgages, security interests, liens or claims whatsoever," and that except for "liabilities expressly assumed by DEPCO under the DEPCO/Receiver Agreement, DEPCO shall not assume or become liable for any other liability" of the credit union or its receiver, "of any kind or nature." The borrower appeared and objected to the application for approval but did not appeal from the order of approval when it was entered.
Even more striking in its declaration of immunity from claims is the transfer agreement of June 24, 1992, itself, which provided in paragraph 7:
 "* * * DEPCO shall not assume or otherwise become liable for any claims against or liabilities of the Institutions or the Receiver to secured creditors, to depositors, to non-deposit or administrative expense creditors of the Institutions whether their claims are liquidated, unliquidated, contingent, known or unknown or otherwise, nor shall DEPCO assume or be or become liable with respect to any setoff or counterclaim or other claim or liability, whether as a successor to or assignee of the Institutions, the Receiver or otherwise, for any other debts or liabilities of, or claims against, the Institutions or Receiver whatsoever, including (without limitation) claims against the Institutions or the Receiver with respect to
violations under any statute such as, for example, 15 U.S.C. §§ 1601 et seq., and regulations issued thereunder, damages for breach of any contract, commitment, letter of credit, guaranty or other agreement by the Institutions to pay or lend money property or provide other value. . . ." (Emphasis supplied).
This provision, taken literally, precludes any liability of the plaintiff for claims against the credit union or its receiver with respect to damages for any breach of contract or other agreement by the credit union to lend money. At this juncture it must be pointed out that the defendants are not seeking to hold DEPCO liable for any damages they have incurred, but rather that the damages they owe DEPCO should, in equity, be reduced by the damages they have sustained as a consequence of the credit union's breach of the contract to lend them money, out of which their indebtedness to DEPCO arises.
Cases similar to this have come before the Supreme Court on three occasions, but none like this one, after a full hearing on the merits with a complete record. They are: DEPCO v. NFDCompany, 687 A.2d 452 (R.I. Jan. 23, 1997); DEPCO v. WashingtonCounty Land Company, 694 A.2d 720 (R.I. June 6, 1977); and DEPCOv. Tasca, 729 A.2d 707 (R.I. 1999).
In NFD Company, supra, DEPCO sued NFD on the balance due on a deficiency after a foreclosure of a mortgage securing advances made by Marquette Credit Union on a $7 million loan. When DEPCO moved for summary judgment, NFD claimed that Marquette's failure to fund the development project intended to be financed by the loan constituted a failure of consideration and entitled it to equitable recoupment of its consequential damages. This Court's denial of summary judgment was reversed on certiorari and judgment was ordered by the Supreme Court for DEPCO.
The Supreme Court held that in the absence of an express written agreement by Marquette to fund NFD's real estate development fully, G.L. 1956 § 42-116-23, which codified the so-called D'Oench, Duhme doctrine, limits defenses against DEPCO's claims to those arising from explicit written obligations. In the absence of a showing that Marquette had agreed in writing to fund NFD's development fully, it was error to deny DEPCO's motion.
NFD Company, supra, is not dispositive of this case. The loan agreement in this case, which is an integral component of the entire elaborate financing transaction among the parties, is in evidence. While not unconditional, RICCU's obligation to continue to fund the defendants' project, at least beyond the initial advance, is plain for any person reasonably literate in the English language to read and understand. D'Oench, Duhme and its progeny are more than satisfied. Summary judgment was properly denied by this Court in this case, and, of course, that denial was properly affirmed by the Supreme Court.
In Washington County Land Company, supra, handed down nearly six months later, the Supreme Court dealt with the granting of summary judgment for DEPCO under circumstances similar to those in this case. Washington had executed a note to RICCU for $1.8 million. The funds advanced under the note were intended to finance the development of real estate under a written loan agreement. As here, DEPCO sued on a deficiency after the balance of an indemnity deposit and the proceeds of a foreclosure of a mortgage of the real estate had been applied to the indebtedness. The defendants opposed the motion for summary judgment on the ground that the failure to fund the agreement constituted a material breach of their agreement with RICCU and was, accordingly, a complete defense to DEPCO's claim. DEPCO argued that there was nothing in the note or in the loan agreement that required RICCU to continue to fund Washington's land development as a condition precedent to payment on the note. The Supreme Court agreed. The Court concluded, "that absent the showing of any explicit loan documentation language that made payment under the note in question conditioned upon RICCU's obligations pursuant to the indemnification and loan agreements, the Superior Court's grant of summary judgment was proper. See Howell v.Continental Credit Corp., 665 F.2d 743, 747 (7th Cir. 1981)." (Emphasis supplied). Id., at 722.
It should be noted that the defendants do not claim in this case that their obligation under the note and the guarantees to repay the loan advances, is conditioned upon RICCU's obligation to make the loan advances agreed to in the written loan agreement. They argue that it is inequitable not to reduce the damages to which DEPCO is entitled by the damages which they sustained as a consequence of that breach. This Court agrees. Since they do not make the claim that RICCU's failure to fund their project is an absolute defense to DEPCO's claim, WashingtonCounty Land Co., supra, is not dispositive.
DEPCO v. Tasca, supra, the latest of the "failure-to-fund" triad, is characterized by the Supreme Court as "remarkably similar" to NFD Company, supra. Once again, the guarantors on a loan from a credit union were attempting to defend against a DEPCO claim on a default of the loan obligation on the ground that the credit union lender had failed to fund the development fully. The guarantors failed to produce a writing under which the lender was obligated to fund the borrower's project. It was easy for the Supreme Court simply to apply the D'Oench, Duhme doctrine and the holding in NFD Company, supra, to this case. For the same reasons that NFD Company is not dispositive, so is Tasca, supra.
This Court cannot find anything in the three decisions of the Supreme Court to justify the plaintiffs assertion that the explicit agreement by the lender to continue to fund a project to the agreed financing limit must be unconditional to allow a defendant to assert a recoupment defense.
The common law plea of recoupment allows a defendant to plead in defense of a claim that the plaintiff is in breach of an obligation arising out of the same transaction which forms the basis for the plaintiff's claim. Villa v. Hedge, 96, R.I. 52; 56,188 A.2d 904 (1963). While the loan agreement, on the one hand, and the note and the guarantees, on the other hand, may be separate and independent in that the obligation to pay the note is not conditioned on the lender's performance of its obligations in the agreement, they are nevertheless, plainly connected and interrelated parts of an integrated transaction. If the defense of recoupment ever has any vitality, it should allow a party to recoup losses for a breach of the loan agreement from losses from a breach of the note issued pursuant to the loan agreement. SeeHill v. Southwick, 9 R.I. 299 (1869), where the Supreme Court affirmed the converse.
Section 42-116-6(2) empowers DEPCO to acquire assets of a failed institution without assuming any liabilities of the institution. DEPCO thereby can acquire the indebtedness owed to the failed institution, but does not assume any liability of the institution. The statute does not expressly permit DEPCO to acquire indebtedness assets free of recoupment defenses. The debtor's right to recoupment is not a claim of liability. Recoupment is no less a "real" defense than, say, partial payment mistakenly not credited by the institution. A defense of partial payment might arguably be the same as a claim of liability for failing properly to credit a payment, but, surely, no one would argue that DEPCO takes a debt free of claims of payment or allowance of credits agreed to in writing. A fair construction of the statute is that the liabilities not assumed by DEPCO are those which are stangers to the transaction on which the debt acquired as an asset is based.
The defendants have demonstrated that DEPCO acquired their indebtedness with full notice that the indebtedness was an impaired asset. DEPCO took possession not only of the note, the mortgage, and the guarantees, but also of the loan agreement as well. DEPCO knew that RICCU had obligated itself to lend the borrower $1.2 million, with as much as $900,000 of outstanding principal at any time. DEPCO knew that its assignee had not funded the borrowers' project as it had agreed. DEPCO surely knew that the borrower had made a claim in the receivership proceeding for its consequential damages. There is no evidence that the receiver has ever disallowed or contested the claim.
The plaintiff argues that the borrower was in default of its obligations on the note by failing to pay the first installment of interest when it was due and had failed to comply with certain of the conditions of the loan agreement, such as, for example, submission of construction contracts for the lender's approval. Even if the borrower was in technical default of its obligations, those defaults are not such material breaches as to excuse the lender from its performance of its obligation to fund the development as it agreed.
Having decided that the defendant borrower is entitled to recoup its damages from the plaintiff DEPCO's claim, the Court must decide how much can the defendants recoup.
The defendants claim that they may recoup what they call "wasted" costs, which they invested in the project and which they "lost" as a consequence of the failure of continued funding from RICCU or its receiver. The defendants' theory is that, if the project had been developed to completion, those costs would have been recovered by the sale of the condominium units. The defendants' evidence proffered in support of that theory is competent, credible, unrebutted, uncontradicted, and utterly persuasive. There was every reasonable expectation of economic success for this project. Not only could the investors and financiers reliably expect that all of the costs of development would be recovered, the investors could also reasonably have expected a tidy return on their investment.
The plaintiff's argument that, if the project was so certain of economic success, the investors could have bailed it out, themselves, and not allowed the loan to go into default, does not consider the totality of the financing chaos into which the entire real property development business in Rhode Island was plunged in January 1991. Although the investors may have had the personal resources to bail the project out, there is no evidence that those resources were sufficiently liquid at the time. Nor was there any reason for them to believe that the receiver would not have realized the harmful impact of his refusal to continue to fund the project. The receiver had a choice. He could continue to fund the project as the insolvent institution was legally bound to do, or he could liquidate it, as he had a legal right to do. If he did liquidate, however, the consequence must be that the party injured by that choice ought to be allowed in equity at least to recoup its damages from any deficiency claim.
DEPCO, of course, knew the choice the receiver had made when it acquired the deficiency claim as an asset, since the foreclosure sale was made after the transfer was approved by the Court but before the transfer was actually made.
Computing the damages to which the borrower would be entitled from a solvent lender in this case would be a daunting task. Suffice it to say that by the time the receiver chose to sell the real estate at the foreclosure sale, the investors had lost more than the $525,000 advanced by the lender.
The attributable cost of the land was proved by the evidence to be $410,869.37. Out-of-pocket development costs were by competent, credible evidence proved to be $353,151.13, as were indirect costs of $67,650.00. The Court is satisfied from the evidence that all of these costs would have been recaptured had the development been financed as agreed. They are accordingly recoverable as damages.
Since the damages which the defendants are entitled to recoup from plaintiff plainly exceed the plaintiffs damages as of the time of the foreclosure, when the receiver's decision to continue to finance the development became irreversible as a practical matter, the plaintiff is not entitled to any amount of damages on its claim.
Accordingly, judgment should enter for the defendants.